RECORD NO. 14-1108

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**ROBERT WAYNE HUMPHREY, JR. and
CRYSTAL MARIE HUMPHREY,**

*Plaintiffs-Appellants,*

v.

**DAY & ZIMMERMAN INTERNATIONAL,
INCORPORATED,**

*Defendant-Appellee.*

---

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA AT GREENVILLE**

Blake A. Hewitt
John S. Nichols
BLUESTEIN, NICHOLS,
  THOMPSON & DELGADO
P. O. Box 7965
Columbia, South Carolina 29202
(803) 779-7599 (Telephone)
bhewitt@bntdlaw.com
jsnichols@bntdlaw.com

Counsel for Plaintiffs-Appellants

Gary W. Poliakoff
POLIAKOFF & ASSOCIATES, P.A.
P. O. Box 1571
Spartanburg, South Carolina 29304
(864) 582-5472 (Telephone)
atty@gpoliakoff.com

Counsel for Plaintiffs-Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.     Does party/amicus have any parent corporations?                              YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              YES     NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                            YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                        _____
        (signature)                                            (date)

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    South Carolina has adopted a modified version of comparative negligence which generally entrusts the jury with the task of weighing the parties' degrees of fault . . . . . . . . . . . . . . . . . . . . . 6

    B.    The only times when comparing fault is *not* a task for the jury is when there is no evidence of the defendant's negligence or when there is no logical connection between the defendant's negligence and the plaintiff's injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    The present case is not one of these extraordinary cases. The questions of whether Bobby Humphrey was negligent and whether his negligence contributed to his injury were questions for the jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Request for Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Compliance

Certificate of Filing and Service

i

# TABLE OF AUTHORITIES

## Cases

*Bass v. Gopal, Inc.*,
   680 S.E.2d 917 (S.C. Ct. App. 2009) . . . . . . . . . . . . . . . . . . . 9

*Bloom v. Ravoira*,
   529 S.E.2d 710 (S.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Bullard v. Erhardt*,
   324 S.E.2d 61 (S.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Charbonnages de France v. Smith*,
   597 F2d 406, 414 (4th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . 6

*Cole v. Boy Scouts of America*,
   725 S.E.2d 476 (S.C. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Creech v. South Carolina Wildlife & Marine Res. Dep't*,
   491 S.E.2d 571 (S.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18, 20

*Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*,
   508 S.E.2d 565 (S.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 18, 19, 20

*Driggers v. City of Florence*,
   2 S.E.2d 790 (S.C. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Estate of Haley ex rel. Haley v. Brown*,
   634 S.E.2d 62 (S.C. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . 9, 10

*Graham v. Whitaker*,
   321 S.E.2d 40, 44 (S.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hubbard v. Taylor*,
   529 S.E.2d 549 (S.C. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . 10, 15

ii

*Hurst v. East Coast Hockey League*,
 637 S.E.2d 560 (S.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jennings v. Univ. of N.C.*,
 482 F.3d 686, 694 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 5

*Langley v. Boyter*,
 325 S.E.2d 550 (S.C. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . 6, 7

*Langley v. Boyter*,
 332 S.E.2d 100 (S.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*McKenzie v. Leeke*,
 357 S.E.2d 721 (S.C. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . 10

*Nelson v. Concrete Supply Co.*,
 399 S.E.2d 783 (S.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ott v. Pittman*,
 463 S.E.2d 101 (S.C. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . 8, 9

*Peterson v. Nat'l R.R. Passenger Corp.*,
 618 S.E.2d 903 (S.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pierce v. Ford Motor Co.*,
 190 F.2d 910, 915 (4th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . 5

*Priest v. Brown*,
 396 S.E.2d 638 (S.C. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . 10

*Shepard v. South Carolina Dep't of Corr.*,
 385 S.E.2d 35 (S.C. Ct. App. 1989) . . . . . . . . . . . . . . . . . . . 10, 16

*Simmons v. Poe*,
 47 F.2d 1370, 1378 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 5

iii

*Snavely v. AMISUB of S.C.*,
    665 S.E.2d 222 (S.C. Ct. App. 2008) . . . . . . . . . . . . . . . . . . . 9

*Trivelas v. South Carolina Dep't of Transp.*,
    558 S.E.2d 271 (S.C. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . 8

## Statutes

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## JURISDICTIONAL STATEMENT

This is a personal injury lawsuit involving a substantial claim for money damages. The plaintiffs are citizens of South Carolina. The defendant is a Pennsylvania corporation. The plaintiffs filed this suit in district court alleging diversity jurisdiction under 28 U.S.C. § 1332.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 which authorizes appellate review of a district court's "final decision." The district court has issued a final decision in this matter having granted summary judgment to the defendant on January 31, 2014. (JA 532-544).

The plaintiffs filed their notice of appeal February 3, 2014. (JA 545).

## STATEMENT OF THE ISSUE

Whether the District Court erred when it summarily held that Bobby Humphrey's conduct was the sole cause of his injuries and that Bobby's negligence—which may or may not have actually contributed to his injury—exceeded the defendant's negligence as matter of law.

## STATEMENT OF THE CASE

On December 30, 2009, Ricky Page, a Day & Zimmerman employee, improperly cut into a hazardous chemical pipe while working at a chemical plant operated by Cytec Industries in Greenville, South Carolina. Mr. Page was attempting to cut a water line but misidentified the pipe in question. (JA 208). Cutting into the

1

wrong line caused a highly toxic and hazardous substance, acrylonitrile, to spray from the cut pipe, onto pipes, tanks, equipment, and a concrete floor, for a significant period of time until Cytec operators managed to shut off the flow. (JA 351-367, 446-450).

Bobby Humphrey worked on Cytec's maintenance staff and was part of the three man crew that repaired the damage. (JA 68-70). He filed this lawsuit in June of 2012 claiming that he suffered disabling injuries to his respiratory and pulmonary systems as a result of inhaling a toxic chemical while he was doing the repair work. (JA 9-10) (the factual allegations of the complaint).

Bobby alleged multiple acts of negligence against Day & Zimmerman. These included allegations that Day & Zimmerman failed to properly plan the task of cutting the water line, and that Day & Zimmerman also failed to properly train its at-fault employee. (JA 10-12) (the complaint's negligence allegations). Day & Zimmerman's own Accident Investigation Report admitted multiple violations of safety rules. (JA 318-323).

Day & Zimmerman raised several defenses. Among these were the defenses that Bobby knew the risks of being injured because he knew about working with hazardous chemicals, that Bobby had himself been negligent as he attempted to repair the pipe, and that Bobby's own negligence was the sole legal cause of his injuries.

2

(JA 17-18). The claims against Bobby included claims that he did not use his protective equipment properly while fixing the pipe and that he did not tell his supervisors after he knew that the chemical had spilled on him. See generally (JA 58) (Day & Zimmerman's list of Bobby's allegedly negligent conduct).

Day & Zimmerman moved for summary judgment in April of 2013. To support its motion, it relied on these same arguments: that Bobby knew this chemical was dangerous, that Bobby had himself been negligent in his work, and that Bobby's own negligence was the sole legal cause of his injuries. (JA 25-60) (Day & Zimmerman's motion and memo in support).

Bobby opposed summary judgment and argued that these were comparative negligence questions which South Carolina law entrusts to a jury. He admitted several of Day & Zimmerman's claims—for example, he admitted that he had not taped the seams between his protective suit and his gloves and boots—but he opposed summary judgment because he said that while these and other failures might have led to the chemical burns on his skin, they had nothing to do with his disabling injuries, which were the result of inhaling the chemical, not touching it. (JA 303-05). Where Day & Zimmerman said that the chemical inhalation was Bobby's fault, Bobby disputed that argument and claimed that on balance, all of his conduct that actually mattered was reasonable (or at least foreseeable) under the circumstances. *Id*.

3

The district court granted Day & Zimmerman's motion and adopted Day & Zimmerman's arguments virtually verbatim. The court held that Bobby's failure to follow some safety procedures regarding protective gear was the sole cause of his injuries, (JA 540-41); that Bobby had "freely and voluntarily" exposed himself to the chemical in question, (JA 542-43); and that Bobby's fault for his injury exceeded Day & Zimmerman's fault as a matter of law. (JA 543-44). This appeal followed.

## SUMMARY OF ARGUMENT

With the utmost respect for the district court, its decision to grant summary judgment is controlled by an incorrect application of South Carolina law. This is not a "remote cause" case, it is not an "intervening cause" case, and it is not an "assumption of the risk" case. This is a comparative negligence case, and under South Carolina law, the task of comparing the plaintiff's negligence to the defendant's negligence is generally a task for the jury.

The only instances when this is not true—the only instances when comparative negligence is *not* a jury question—do not appear here. There is no need for a jury if there is no evidence that the defendant was negligent or if there is no reasonable link between the defendant's negligence and the plaintiff's injury. This case fails both counts. Day & Zimmerman's employee created a hazardous chemical spill. Fixing

this required repair to the hazardous chemical pipe. It was foreseeable for this to result in an injury, and it was foreseeable for the injured person to be the repairman.

A fact-finder needs to decide the point at which Bobby's injury occurred, a fact-finder needs to decide whether Bobby's actions were reasonable, and a fact-finder needs to decide how any of Bobby's *un*reasonable actions compare to Day & Zimmerman's negligence in creating this dangerous condition. The district court erred in taking these questions away from the jury. This Court should reverse.

### STANDARD OF REVIEW

This court reviews a district court's granting of summary judgment *de novo* in the light most favorable to the non-moving party. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 694 (4th Cir. 2007); *Simmons v. Poe*, 47 F.2d 1370, 1378 (4th Cir. 1995). Accordingly, the court must consider the pleadings and all allegations and determine whether there is a genuine issue of material fact to be submitted to a trier of fact. Fed.R.Civ.P. 56(c). A court may not "try the case in advance by summary judgment." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951).

In reviewing the district court's summary judgment order, an appellate court "must assess the evidence as forecast in the documentary materials before the court in the light most favorable to the party opposing the motion" and accept the non-

movant's version of all that is in dispute. *Charbonnages de France v. Smith*, 597 F2d 406, 414 (4th Cir. 1979).

**ARGUMENT**

This is a comparative negligence case, and under South Carolina law, the task of comparing the defendant's negligence and the plaintiff's negligence is generally a task for the jury. This is not a "remote cause" case, it is not an "intervening cause" case, and it is not an "assumption of the risk" case. The decision to take this case away from the jury was error.

**A.    South Carolina has adopted a modified version of comparative negligence which generally entrusts the jury with the task of weighing the parties' degrees of fault.**

At common law, the doctrine of contributory negligence imposed a bar to a plaintiff's recovery if the plaintiff's actions contributed in any way to his or her injury. There were exceptions to this rule, but in general, this doctrine provided that if the plaintiff's injury was at all the plaintiff's fault, the plaintiff had no right to sue for damages, even if the defendant's share of the blame was greater.

South Carolina formally abandoned this doctrine in the early 1990's. The State's Court of Appeals had extensively criticized contributory negligence in *Langley v. Boyter*, 325 S.E.2d 550 (S.C. Ct. App. 1984), and though the State Supreme Court initially quashed that decision, see 332 S.E.2d 100 (S.C. 1985), the

6

court subsequently adopted *Langley*'s approach in *Nelson v. Concrete Supply Co.*, 399 S.E.2d 783, 784 (S.C. 1991).

Since the *Nelson* decision, South Carolina has followed a modified version of the comparative negligence doctrine.  This doctrine provides that a plaintiff may recover damages as long as the plaintiff's share of the fault for the injury is not greater than the defendant's share of the fault for the injury.  The plaintiff's recovery will be reduced in proportion to the amount of his or her comparative fault, and if there is more than one defendant, the plaintiff's negligence will be compared to the combined negligence of all of the defendants.  *Id*.

If there is evidence that both the plaintiff and the defendant were negligent, South Carolina courts have held that the task of comparing the parties' negligence is for the jury.  For example, the plaintiff in *Davenport v. Cotton Hope Plantation Horizontal Property Regime*, brought suit against his condominium association after he fell down a stairway that he argued had poor lighting.  See 508 S.E.2d 565 (S.C. 1998).  In defense of the suit, the association claimed the plaintiff knew that the lighting in this stairway was poor and had made a conscious decision to use these stairs anyway.  The trial court directed a verdict for the association, reasoning that the plaintiff had assumed the risk of his injury, but the Supreme Court reversed and remanded the matter for trial.  The court reasoned that the questions of proximate

7

cause and the degrees of the parties' negligence should have been submitted to the jury. *Id*. at 574-75.

*Davenport* is not an outlier. South Carolina courts consistently observe that comparing the plaintiff's negligence with the defendant's negligence is generally a question of fact for the fact-finder. See, e.g., *Trivelas v. South Carolina Dep't of Transp.*, 558 S.E.2d 271, 277-78 (S.C. Ct. App. 2001); *Ott v. Pittman*, 463 S.E.2d 101, 106 (S.C. Ct. App. 1995).

> **B.    The only times when comparing fault is *not* a task for the jury is when there is no evidence of the defendant's negligence or when there is no logical connection between the defendant's negligence and the plaintiff's injury.**

The principle that it is the jury's job to compare the parties' fault holds true even when the defendant contends that the danger of injury is obvious.

This was the controlling reasoning in *Davenport*—where the plaintiff fell while walking down a stairway which he apparently knew to have insufficient lighting. It was also controlling in *Creech v. South Carolina Wildlife & Marine Resources Dep't*, where the State Supreme Court affirmed the decision to send the case to the jury over the defendant's argument that the lack of a rail on a boat dock was an obviously dangerous condition. 491 S.E.2d 571 (S.C. 1997).

8

In *Ott v. Pittman*, the defendant claimed that the plaintiff's suit was barred by the fact that the plaintiff's injury was partially due to the plaintiff's violation of a statute, which constitutes negligence *per se*. Again, the appellate court held that a comparison of the parties' negligence was a task for the jury. 463 S.E.2d at 105-06. The reason for this rule seems plain. If the evidence suggests that multiple parties were negligent, it is usually possible for the jury to draw many different conclusions regarding the parties' relative fault.

The only times when this has not been the case—the only instances when comparative negligence has *not* presented a jury question—have been where there is no evidence of the defendant's negligence, or, where there is no logical connection between the defendant's negligence and the plaintiff's injury. One might think that such cases would be relatively rare, but there are a few examples.

The "no evidence of defendant negligence" cases include *Bass v. Gopal, Inc.*, 680 S.E.2d 917 (S.C. Ct. App. 2009); *Snavely v. AMISUB of South Carolina*, 665 S.E.2d 222 (S.C. Ct. App. 2008); *Estate of Haley ex rel. Haley v. Brown*, 634 S.E.2d 62 (S.C. Ct. App. 2006); *Bloom v. Ravoira*, 529 S.E.2d 710 (S.C. 2000); and *Bullard v. Erhardt*, 324 S.E.2d 61 (S.C. 1984). In each of these cases, there was truly *no* evidence that the defendant failed to act reasonably under the circumstances. *See Bass*, 680 S.E.2d at 921 (no prior violence at defendant's motel); *Snavely*, 665 S.E.2d

9

at 225-26 (no evidence doctor breached any duty); *Haley*, 634 S.E.2d at 64 (no evidence defendant was driving unreasonably); *Bloom*, 529 S.E.2d at 713-14 (same); and *Bullard*, 324 S.E.2d at 62 (no evidence the tavern owner acted unreasonably).

The cases where there was no logical connection between the defendant's negligence and the plaintiff's injury include *Hubbard v. Taylor*, 529 S.E.2d 549 (S.C. Ct. App. 2000); *Priest v. Brown*, 396 S.E.2d 638 (S.C. Ct. App. 1990); *Shepard v. South Carolina Department of Corrections*, 385 S.E.2d 35 (S.C. Ct. App. 1989); *McKenzie v. Leeke*, 357 S.E.2d 721 (S.C. Ct. App. 1987); and *Driggers v. City of Florence*, 2 S.E.2d 790 (S.C. 1939). An example may help to illustrate how this particular principle applies. The defendant in *Hubbard* operated a nursing home, and his act of alleged negligence was that he left his car unlocked with a container of antifreeze visible in the back seat. The lawsuit arose after a semi-lucid nursing home patient climbed inside the car, drank some of the antifreeze, and died. The court wrote that the decedent's act of ingesting the antifreeze was "too remote" to be attributable to the defendant's simple negligence in leaving his car doors unlocked. *Id*. at 592.

These two categories of cases could not properly be called "comparative negligence" cases. There is no negligence to compare if none of the defendant's actions were unreasonable, and there is no negligence to compare if the defendant's

10

unreasonable conduct is innocuous and if the risk of injury is infinitesimally small. Neither scenario involves parties with degrees of negligence that are legitimately comparable to one another. Legitimate cases must always go to the fact-finder.

**C. The present case is not one of these extraordinary cases. The questions of whether Bobby Humphrey was negligent and whether his negligence contributed to his injury were questions for the jury.**

With the utmost respect for the district court, it is difficult to see how this is not an ordinary case of comparative negligence. Day & Zimmerman's employee cut a hazardous chemical pipe. Fixing this required someone to repair the hazardous chemical pipe. This was dangerous work. It was foreseeable for this work to result in an injury to someone, and it was foreseeable for the injured person to be the repairman who was tasked with fixing the damage.

     i.    A reasonable jury could conclude that Day & Zimmerman's negligence outweighs any of Bobby's conduct that was unreasonable.

Bobby's complaint alleged 24 acts of negligence and recklessness against Day & Zimmerman. (JA 8-12). The general theory of these allegations was that Day & Zimmerman failed to properly plan the task of cutting the water line and that Day & Zimmerman also failed to properly train its at-fault employee. All of these allegations

11

of negligence were admitted by Day & Zimmerman in its Accident Investigation Report. (JA 318-323).

Bobby submitted evidence to the district court that supported this theory. He presented a Day & Zimmerman document which listed "inadequate planning" and "inadequate inspection" as the cause of the chemical spill, (JA 319), he presented deposition testimony from Day & Zimmerman's workers in which these workers asserted that they had not been trained in the appropriate procedures for this particular job, (JA 345, 357-58, 403), and he presented Day & Zimmerman's written reprimand of its at-fault employee. (JA 394). This evidence does not *conclusively* establish the degree of Day & Zimmerman's negligence or recklessness, but the reason that violations of internal policies and procedures are admissible is that these policies aid the jury in determining *whether* the defendant exercised due care. *Peterson v. Nat'l R.R. Passenger Corp.*, 618 S.E.2d 903, 906 (S.C. 2005). It would seem obvious that a reasonable jury might find a great deal of fault with Day & Zimmerman's conduct in this situation, as well as recklessness. If Day & Zimmerman was failing to train or supervise its employees, and violating its required safety procedures, and then turning those employees loose at a hazardous chemical plant, the situation was ripe for disaster. Multiple witnesses for the Defendant admitted knowledge of the

12

presence of hazardous and dangerous substances and the requirements for the safety procedures.

The same jury could also potentially find that on balance, all of Bobby's conduct that mattered was reasonable under the circumstances.

Though Day & Zimmerman will say that Bobby's protective suit was too small for him, one of Bobby's supervisors who was present did not observe Bobby's suit fitting improperly. (JA 84). Day & Zimmerman will also say that Bobby "did not respect" the hazardous chemical in question, but Bobby's co-workers uniformly referred to him as a diligent and conscientious worker. (JA 87, 341, 432-33, 450-52). There is other evidence that supports this view. Bobby's first response when learning of the spill was to grab a protective mask before running to the scene. (JA 416-17). And when the three man team was preparing to fix the pipe, the men shaved their faces so they would have a tight seal with their protective masks. (JA 89). Testimony suggested that this was done on Bobby's suggestion. (JA 121-22). Also, Bobby and his crew waited for instructions from their Safety Director and supervisors. (JA 420-421). These actions suggest diligence, not a carefree and reckless attitude.

Day & Zimmerman will say that Bobby should have told his supervisors after the chemical spilled on him, but Bobby presented evidence that his supervisors observed his work and knew what was happening. (JA 126, 495-96, 528). And while

13

Day & Zimmerman will say that Bobby should have taken better care of his protective gear, Bobby presented evidence that it was impossible for his protective gear to remain intact under the conditions. (JA 434). Bobby was tasked with removing 12 to 15 feet of pipe that contained an unknown quantity of hazardous chemical, he was working 15 feet off the ground, and he was working in 30 degree rain. (JA 419-427, 450). By any reasonable standard, this was grueling and hazardous work.

As the party seeking summary judgment, it was Day & Zimmerman's burden to conclusively establish that no reasonable jury could view Bobby as having the lesser degree of fault. While a jury might not ultimately agree with the narrative articulated in the preceding paragraphs, it should be obvious that a reasonable jury *could* adopt this view and find in Bobby's favor.

> ii. Day & Zimmerman will say that there is no logical connection between its negligence and this injury, but subsequent negligence is generally foreseeable.

Day & Zimmerman's strategy in the district court was to downplay the dangerousness of this situation. It argued that although the chemical spill might have been an emergency when it happened, the emergency abated once the spill was under control. Day & Zimmerman believes that this should be the point where its responsibility ends. Even though someone might well have been seriously injured during the spill—fortunately, no one was—and even though the repair work seems

14

to have been both difficult and dangerous, Day & Zimmerman says that its liability ends once the situation gets relatively under control.

The problem with this view is that it conflicts with South Carolina law. The standard for the defendant's liability is not tied to whether the situation gets better before it gets worse. The standard is whether the defendant should have foreseen that his negligence would probably cause injury to someone. *Hubbard*, 529 S.E.2d at 552. And acts of negligence by someone else do not generally absolve the defendant of liability. The intervening negligence of an injured's plaintiff's doctor, for example, is foreseeable. *Graham v. Whitaker*, 321 S.E.2d 40, 44 (S.C. 1984).

The point is this: let us assume that Bobby broke some safety rules regarding protective gear. Why could a jury not view these missteps as being similar in character to the Day & Zimmerman violations which led to the severed pipe that Bobby was replacing? If this situation was caused by someone not following company policy or by someone not being trained in company policy, why is it unforeseeable that the people involved in fixing the situation might break company policy themselves or fail to execute their task with precision?

This is not a case of a "remote cause" or an "intervening cause." Day & Zimmerman's negligence posed a significant risk of harm in its own right, and there was no "intervening" actor who stepped between Bobby and Day & Zimmerman and

15

unexpectedly caused Bobby's injury. See, e.g., *Shepard*, 385 S.E.2d at 37 (the criminal conduct of a third party is generally not foreseeable). This is a comparative negligence case, and the task of comparing the parties' negligence was for the jury.

> iii.    Though Day & Zimmerman will say that this is an assumption of the risk case, it is not. That analysis is for the jury to perform as it compares the parties' shares of negligence to each another.

There is not a substantial body of evidence that establishes the most likely point at which Bobby inhaled the hazardous chemical. Much of Bobby's inhalation occurred through no fault of his own. The repair job of the hazardous line required him to wear a full protective suit with boots and gloves, as well as a hard hat, harness and tether, and Scott Air Packs (air bottle and face mask). The repair job also required him to work approximately 15 feet above a concrete floor, while standing alternately on a scissors lift, pipes, racks and sprinkler heads. The job required extensive physical exertion, and even with cold and freezing rain on him at times, he perspired. The work lasted approximately five hours, was difficult and in cramped positions, at times reaching and up and over, while elevated. (JA 421-428). Every 20 to 30 minutes he had to climb down to change air tanks. (JA 133-134). At times, due to perspiration and exertion, his face mask lost its seal. (JA 145-148, 274-275). At other times the exertion caused condensate inside his mask. (JA 132, 281-282).

16

And when the hazardous substance spilled from the pipe onto him, while working feverishly to capture this additional hazardous substance, he ran out of air. (JA 152-153). Such inhalations were most likely not the fault of Bobby. Much of the alleged acts of negligence cited by Defendant relate to dermal exposure more than inhalation. Plaintiff's experts Dr. Gregory Feldman (treating pulmonologist) and Dr. Thomas Dydek (toxicologist) will testify that Bobby's disability is caused by the inhalation, not the dermal exposure. Bobby has opined that the seal on his breathing mask may have been compromised as he was straining to remove a bolt and to lift the busted pipe. (JA 145-148). He has also opined that his mask seal may have been compromised while he was changing out the air packs on his breathing apparatus, which he had to do about every 30 minutes. (JA 274-75). These are hindsight views, because as is probably obvious, Bobby did not immediately realize that he had inhaled any of the hazardous chemical.

This point is relevant because it undermines the district court's conclusion on the question whether Bobby "assumed the risk" of his injury. The district court held that the "undisputed facts" indicated Bobby "freely and voluntarily" exposed himself to this hazardous chemical, (JA 543), but the court cited no evidence showing that Bobby knew he inhaled anything. Moreover, there is affirmative evidence in the *other* direction; there is evidence that the risks of inhalation injuries were not

17

discussed in the pre-repair planning meeting, see (JA 88-89), and there is evidence that when Bobby first began to manifest the symptoms of illness, his illness was not thought to be work-related. (JA 399). It is hard to see how the district court could reach conclusions about "free" and "voluntary" ingestion without having such evidence in the record.

Day & Zimmerman will defend the district court's decision and say that this is a garden-variety case of "assumption of the risk." With the utmost respect for Day & Zimmerman, this Court should reject that argument because it is incorrect. If both the plaintiff and the defendant may have been negligent, the task of comparing the parties' negligence is for the jury.

This was true in *Davenport v. Cotton Hope Plantation*, where the claim was that the plaintiff had assumed the risk of injury by walking down a dimly-lit stairway. See 508 S.E.2d at 574-75. It was also true in *Creech v. South Carolina Wildlife & Marine Resources Department*, where the claim was that the lack of a rail on a boat dock should have been obviously dangerous to the plaintiff. 491 S.E.2d at 574-75. Both claims went to a jury, and the claim against Bobby Humphrey is the same. The defendants in *Davenport* and *Creech* were seeking a pass on liability by pointing to the fact that the plaintiffs had disregarded a known and identifiable risk of injury. That is precisely the same pass that Day & Zimmerman is seeking here.

18

The *Davenport* decision contains a detailed discussion of the assumption of the risk doctrine and explains that the argument Day & Zimmerman is making has been subsumed by South Carolina's adoption of comparative negligence. "Express" assumption of the risk occurs when the plaintiff expressly agrees, whether in writing or orally, to relieve the defendant of his or her duty of care. 508 S.E.2d at 569-70. If the defendant owes no duty, there is (obviously) no negligence.

"Primary implied" assumption of the risk occurs when there is no express agreement between the parties, but when the natural implication from the plaintiff's actions is that he or she is assuming the risks that are inherent in a particular activity. The most common examples of this category are injuries at sporting events. See *id*. at 570 (citing the examples of an injury that occurred during a football drill and an injury that occurred while watching a softball game); see also *Cole v. Boy Scouts of America*, 725 S.E.2d 476 (S.C. 2011) (participant injured while playing softball); and *Hurst v. East Coast Hockey League*, 637 S.E.2d 560 (S.C. 2006) (spectator at hockey game struck by puck).

Here again, these are "no duty" cases. As *Davenport* explains, primary implied assumption of the risk "focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care." 508 S.E.2d at 570. It is another way of saying that the plaintiff has failed to prove that a duty exists. *Id*.

19

The final category of this doctrine is "secondary implied" assumption of the risk. This category describes the situation when a plaintiff knowingly encounters a risk that was created by the defendant's negligence. *Id*. at 571. *Davenport* holds that this part of the doctrine has been subsumed in South Carolina by the adoption of comparative negligence and that to the extent that the plaintiff is at-fault for assuming the risk of his or her injury, that fault is to be compared with the defendant's negligence. *Id*. at 573-74.

This final category is the category that is at issue in this case. Nobody has argued that Bobby expressly agreed to discharge Day & Zimmerman of any duty, and there does not appear to be any serious argument that Day & Zimmerman did not owe someone like Bobby any duty of care. The only argument that is tenable is that although Day & Zimmerman was negligent in creating this dangerous situation, Bobby was also negligent in his own conduct. That is not an absolute defense to Day & Zimmerman's liability any more than it was an absolute defense in *Davenport* and *Creech*. The comparison of the parties' negligence is for the jury to perform.

## CONCLUSION

A fact-finder needs to decide the point at which Bobby's injury occurred, a fact-finder needs to decide whether Bobby's actions were reasonable, and a fact-finder needs to decide how any of Bobby's *un*reasonable actions compares to Day &

20

Zimmerman's negligence in creating this dangerous condition. In taking these questions away from the jury, the district court erred. This Court should reverse.

### REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Appellant requests oral argument in this matter. Due to the sharp disagreements between the parties on both the facts and law, Appellant believes oral argument will benefit the Court in clarifying and resolving the disputed issues.

Respectfully submitted,

May 1, 2014

Spartanburg, SC

 s/Gary W. Poliakoff
Gary W. Poliakoff (Fed. I.D. #3078)
atty@gpoliakoff.com
Raymond P. Mullman, Jr. (Fed. I.D. #6768)
rmullmanjr@aol.com
POLIAKOFF & ASSOCIATES, P.A.
215 Magnolia Street
P. O. Box 1571
Spartanburg, SC  29304
(864) 582-5472

John S. Nichols (Fed I.D. #2535)
jsnichols@bntdlaw.com
Blake A. Hewitt (Fed I.D. #10542)
bhewitt@bntdlaw.com
BLUESTEIN, NICHOLS,
THOMPSON & DELGADO
P.O. Box 7965
Columbia, South Carolina 29202
(803) 779-7599

Attorneys for Appellants

21

## CERTIFICATE OF FILING AND SERVICE

I certify that on the 1st day of May, 2014, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Daniel B. White, Esq.               Stephanie G. Flynn, Esq.
Gallivan White & Boyd, P.A.         Gallivan White & Boyd, P.A.
P.O. Box 10589                      P.O. Box 10589
Greenville, SC 29603                Greenville, SC 29603

Attorneys for Defendant/Appellee Day & Zimmerman International, Inc.

I further certify that on this 1st day of May, 2014, I caused the required copies of the Brief of Appellant and Joint Appendix to be filed with the Clerk of Court.

s/ Gary W. Poliakoff
Gary W. Poliakoff
POLIAKOFF & ASSOCIATES, P.A.
215 Magnolia Street
P. O. Box 1571
Spartanburg, SC  29304
(864) 582-5472

Attorney for Appellants Robert Wayne Humphrey, Jr. and Crystal Marie Humphrey

22

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____      Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]     this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]     this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]     this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____